# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

PHYLLIS N. GREGORY, individually and
as the personal representative of the estate of
RICHARD D. GATES, deceased,

    *Plaintiff,*

vs.

    Case No. 15-1207-EFM-JPO

CREEKSTONE FARMS PREMIUM
BEEF, LLC,

    *Defendant.*

## MEMORANDUM AND ORDER

This is a wrongful death and survival action over which the Court has diversity jurisdiction. Plaintiff Phyllis Gregory is the mother and sole heir to the decedent, Richard Gates. Gates was a cattle truck driver who was injured on Defendant Creekstone Farms Premium Beef LLC's ("Creekstone's") property while delivering a load of cattle. Gates later died from his injuries. This case is now before the Court on Defendant's Motion for Summary Judgment (Doc. 77). Defendant asserts, among other things, that it did not owe Gates a duty of care. Because the Court finds that Defendant did not owe Gates a legal duty to protect him from known and obvious dangers, the Court grants Defendant's motion.

I.     **Factual and Procedural Background**

**The Accident**

Plaintiff Phyllis Gregory is the mother and sole heir of the decedent, Richard Gates. At the time of Gate's death, Plaintiff was 73 years old. Gates was a cattle truck driver working as an independent contractor for Butler Trucking. In the early morning hours of July 18, 2013, Gates arrived at Defendant's beef slaughtering and processing facility in Arkansas City, Kansas, to deliver a load of cattle.

The majority of cattle deliveries at Defendant's facility occur during the evening shift, from 10 p.m. to 5 a.m. The facility has two receiving pens that truck drivers unload cattle into—an east pen and west pen. The pens run north to south and are separated by a handler alley. Truck drivers unload cattle at the north end of the receiving pen, and then the cattle exit the receiving pen through a gate at the south end and walk into a holding pen.

Defendant's environmental health and safety manager is not aware of any safety protocols for the cattle receiving department at Defendant's facility other than humane handling guidelines for cattle. However, Defendant's supervisor for the cattle receiving department, Butch Fulton, testified that he instructs employee not to get into the receiving pens for safety reasons. Fulton has never observed one of his employees in the receiving pens. He is also not aware of any truck drivers assisting Defendant's receivers in moving cattle through the pen. Fulton testified that he specifically instructs receivers not to allow truck drivers to help them. However, one of Defendant's cattle receivers, Jeremy Irvin, testified that truck drivers would assist in moving cattle after they were unloaded from the trucks once or twice a week.

Gates was experienced at working with cattle. He had been around them since his childhood. He previously worked as the manager of a farm and ranch in Oklahoma that had a

large cattle operation.  He also previously owned his own herd of about 50 head with a neighbor. In the two to three years preceding his death, Gates drove his cattle truck with his friend Sheila Miller.  Miller testified that Gates hauled cattle for Butler Trucking for a year or two before his death.  She also testified that he was experienced in loading and unloading cattle.  When they picked up cattle, she and Gates would help herd them and move them onto the truck.  When Miller and Gates arrived at a destination with cattle, Miller and Gates would herd the cattle out of the truck and then help herd the cattle into a corral, building, or pen.  According to Miller, it was part of their job to move cattle to a holding pen.  In some facilities, such as feed lots, Miller and Gates were required to unload the cattle and move them as much as 300 to 400 yards into a holding pen.  They would do this by walking behind the cattle at a far enough distance not to be kicked but there were no obstructions between them and the cattle.

Gates and Miller arrived at Defendant's facility sometime around 3 a.m. on July 18. Irvin, who was 5'10" in height and weighed 510 pounds, was the only cattle receiving employee present.  Another Creekstone employee, Casey Phillips, was monitoring wastewater in a nearby area.  Phillips testified that he told Irvin some time before the accident that Irvin should tell Creekstone management to get him some help receiving cattle.

Gates backed his truck up to the west receiving pen upon arrival, which was already full from a previously delivery.  Another truck was unloading cattle into the east pen.  After that truck left, Irvin moved the cattle from the west receiving pen into the holding pen.  He did not ask Gates to help him. To move the cattle from the west receiving pen, Irvin walked down the center handler alley and opened the gate at the south end of the west end of the receiving pen. At that time, Gates was standing at the north end of the pens, in the walkway.  Gates then stepped into the west receiving pen at the north end, behind the cattle.  As the cows moved out of the

west pen, Irvin got into the pen behind them at the halfway point and followed them into the holding pen. Irvin does not know what Gates did at that point because he had his back to Gates. Gates did not walk with Irvin to help him move the cows out of the west pen.

After the cattle from the west receiving pen were in the holding pen, Irvin returned to the south end of the receiving pens and opened the south gate of the east pen. Irvin then closed the south gate of the west pen and walked back north in the west pen, crossing into the handler alley at the middle of the receiving pens. At that time, Gates had moved to the north end of the east receiving pen. The cattle were at the south end of the east receiving pen.

The cattle became bunched up at the south end of the receiving pen, so Irvin walked south in the handler alley shaking his paddle to get them moving. As Irvin was doing this, he last saw Gates standing at the north end of the east pen. Irvin did not say anything to Gates about having problems moving the cattle or otherwise.

Irvin was able to get the cattle moving. He then saw a lone cow moving at a "quick trot" through the pen. Irvin began walking north toward the midway point of the pen and noticed Gates lying on the ground. Irvin went to check on him and found him face down with blood coming out of his nose and mouth area.

Irvin instructed Phillips, who had just arrived in the receiving area, to call 911. When EMS arrived, Gates "initially had a weak carotid pulse and shallow, slow respirations." Gates stopped breathing at some point, and EMS started performing chest compressions on him. Gates was transported to the hospital, where he was pronounced dead at 4:32 a.m. The emergency room records indicate that when Gates arrived at the hospital EMS was still performing chest compressions and that he was still unresponsive.

**The Alleged Blind Alley in the Creekstone Receiving Pens**

Plaintiff designated John George as a liability expert witness in this case. George is an agricultural engineer, who describes his professional activities as work on renewable energy, ventilation, surveying, geotechnical work, manure waste handling, and feed lots. According to George, the path south out of Creekstone's receiving pens leads to a 90 degree turn left (or east) toward the holding chutes. George opined that this turn is a design flaw known as a "blind alley"—"one in which the cattle's perspective does not reveal to them that the alley leads to an exit." According to George, the blind alley at the south end of the receiving pen and the water puddling in that area are design flaws that primarily cause the cattle to bunch up and balk at or near the exit of the pen. George testified at his deposition that when a receiver opens the gate out of the east receiving pen, the cattle closest to the gate could probably see an opening and way to leave. But, he also stated that the cattle may bunch up for other reasons.

George further testified that in his opinion, the area at the south end of the east receiving pen constituted a blind alley because "the whole concept of blind alley is that as you're in the alley and you look for an escape. Unless you're looking at the south end in this case you can't see that there is a pathway out. And that's what makes it a blind alley. And cattle don't want to proceed up a blind alley if they can't perceive an exit." George could not, however, offer an opinion that the cattle bunched up on the night of Gates' death because of the presence of a blind alley. George testified that he has no way of knowing why the cow came back and injured Gates.

Defendant designated Joseph Zulovich as its expert. He works as an extension agricultural engineer and defines his responsibility as primarily educational. In his deposition, Zulovich made multiple statements regarding George's opinions. He agreed with George's

conclusion that an agitated or fearful animal often turns around and seeks to escape in the direction from which it came. He found nothing that contradicts George's conclusion that the animal's attempt to escape played a role in Gates' injury. He further testified that it was reasonable for George to presume that a cow kicked, butted, ran over, or stepped on Gates on its way north in the receiving pen. Finally, Zulovich agreed that the blind alley and water puddling at the south end of the receiving pen could possibly be design flaws that cause animals to periodically bunch up or balk at or near the exit of the receiving pen. But he later stated that he did not know this for sure because he did not know how frequently the problem occurred.

**The Current Lawsuit**

Plaintiff filed this wrongful death and survival action almost two years after the accident. In the Pretrial Order, Plaintiff lists 15 different ways she believes Defendant was responsible for Gates' death. These can be summarized into three general categories as follows. First, Plaintiff contends that Defendant had no safety rules, regulations, or protocols in place regarding the safe transfer of cattle from the receiving pen to the holding pens; that Defendant had no rules prohibiting truck drivers from assisting Creekstone employees in the cattle receiving area; that Defendant provided no training or other instruction to truck drivers; and that Irvin violated Fulton's policy of allowing truck drivers in the receiving pens to help with moving the cattle. Second, Plaintiff contends that Irvin had difficulty accessing the handler alley due to his physical stature; that his failure to use the handler alley was the reason that truck drivers assisted him in moving cattle in the receiving pens; and that Irvin's failure to use the handler alley was a major cause of Gates' assistance in the receiving pen. And third, Plaintiff claims that a sharp turn at the end of the receiving pens was a design flaw that created the propensity for cattle to bunch up, which resulted in a dangerous condition for anyone inside the pen trying to move cattle.

Defendant has filed a motion for summary judgment on Plaintiff's claims. The Court held a hearing on Defendant's motion on July 6, 2017.

## II.     Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[1] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[2] The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[3] If the movant carries its initial burden, the nonmovant may not simply rest on its pleading but must instead "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.[4] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[5] The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[6]

---

[1] Fed. R. Civ. P. 56(a).

[2] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[3] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 325 (1986)).

[4] *Id.* (citing Fed. R. Civ. P. 56(e)).

[5] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)).

[6] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

### III.     Analysis

Defendant makes several arguments as to why it is entitled to summary judgment.  First, Defendant argues that the Court should grant summary judgment on all of Plaintiff's claims because it did not owe a duty of care to Gates.  Second, Defendant argues that to the extent Plaintiff relies on the existence of a blind alley to support her claims for negligence, it is entitled to summary judgment because there is no evidence that the blind alley caused Gates' death.  Third, Defendant argues that the Court should grant summary judgment on all claims for pecuniary loss extending beyond Plaintiff's lifespan.  Finally, Defendant claims that it is entitled to judgment on Plaintiff's claims for conscious pain and suffering because there is no evidence that Gates suffered such damages.

#### A.     Duty of Care

Under Kansas law, a plaintiff must establish the following elements to recover for negligence:  (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the breach of that duty was the actual and proximate cause of the plaintiff's injuries; and (4) the plaintiff suffered damages.[7]  Negligence claims generally present a question of fact for the jury to determine.[8]  But, the question of whether a duty of care exists is a legal determination for the court.[9]

At this point in the litigation, it is still not clear what Plaintiff's negligence claims are. Neither the Pretrial Order nor Plaintiff's response to Defendant's motion for summary judgment clearly articulate what duty Defendant owed Gates, how Defendant breached that duty, and how

---

[7] *Hall v. Kan. Farm Bureau*, 274 Kan. 263, 279, 50 P.3d 495, 506 (2002) (citation omitted).

[8] *Eltsun v. Spangles, Inc.*, 289 Kan. 754, 757, 217 P.3d 450, 453 (2009) (citation omitted).

[9] *Id*.

the breach of that duty was the actual and proximate cause of Gates' injuries. When the Court asked Plaintiff's counsel at oral argument to explain her claims, this is the response:

> **Plaintiff's Counsel:**
> What our claim – and, of course, in our complaint we list all the duties that we think that there was a violation of, which they deny all of them except for one. But, really, what it all boils down to, when you peel away all the layers of the onion on this thing, is the fact that Creekstone, through its supervisor, Butch Fulton, recognized it was a hazard, that this is a dangerous and hazard endeavor in processing cattle through a beef processing plant. It's not like moving cattle out in a corral, open corral. You're in a confined area. And when you look at that receiving area, it indicates, you know, the nature of how dangerous this can be because it has metal pipes separating an alley for the employees to walk down. And Creekstone, through its own Robert Sullivan, who is in charge of PR and HR—not PR, HR, and safety, said we never established any safety protocols for that most dangerous area that we have in our plant, and that is receiving cattle and moving cattle through the plant.
>
> But the receiving supervisor, Butch Fulton, recognized that. And he said, "I had a policy. You don't get in. . . . You don't get in the receiving alley. I instructed Jeremy Irvin, when he was hired, and I trained him and instructed him, that you don't get in there. You don't get in there, and I don't want you letting the truck drivers in there, because they don't know our policies and procedures. We don't want them in there either, because it's too risky."
>
> **The Court:**
> Do you think Creekstone's own internal policies give rise to a legal duty to a third party?
>
> **Plaintiff's Counsel:**
> Well, the case law says it's not determinative but it certainly is instructive as to whether or not it creates a legal duty, and you have to look at the facts and circumstances of each case. And, certainly, it is instructive in making a determination as to whether or not there's a legal duty.

This discussion did not resolve the Court's confusion. However, later in the hearing, Plaintiff's counsel stated that Plaintiff was asserting a general negligence claim. The Court then asked counsel what legal duty Defendant owed Gates. Plaintiff's counsel responded: "[Defendant's] legal duty was to . . . enforce the rule, their safety rule, to keep truck drivers out of their area."

-9-

He then stated, "they also had a legal duty to adequately staff that receiving department so they could process the cattle and didn't need . . . help to do that, which because Jeremy Irvin violated the rule precipitated truck drivers to get in and help him."

The question before the Court is whether Defendant owed Gates the legal duties that Plaintiff claims it did above. Generally, under Kansas law, each person has the duty to act as a reasonably prudent person would in similar circumstances.[10] This duty, however, does not extend to all circumstances.[11] A person owes a legal duty to another if (1) the plaintiff is a foreseeable plaintiff and (2) the probability of harm is foreseeable.[12] "So an individual must act like a reasonably prudent person toward another individual *if* there is some sort of relationship between the two individuals that justifies imposing a legal obligation on one for the benefit of the other—a relationship based on foreseeability."[13] Therefore, in this case, Defendant only owed a legal duty to Gates if it was foreseeable that he would have been harmed at Defendant's facility.

Defendant argues that the probability of harm was not foreseeable and thus it did not owe Gates any legal duty. In support of this argument, Defendant relies on Kansas premise liability law. "Premises liability is simply '[a] landowner's or landholder's tort liability for conditions or activities on the premises.' "[14] Plaintiff, on the other hand, argues that this case should not be viewed in the context of premises liability. Plaintiff claims that she is asserting a general negligence claim, and thus, Kansas premise liability law does not apply. But, Plaintiff has not

---

[10] *Manley v. Hallbauer*, -- Kan. Ct. App. --, 387 P.3d 185, 188 (2016).

[11] *Id*.

[12] *Id*. (quoting *Berry v. Nat'l Med. Servs.*, 292 Kan. 917, 920, 257 P.3d 287, 290 (2011)).

[13] *Id*. (citing Prosser and Keeton, Law of Torts, § 53 (5th ed. 1984)).

[14] *Didde v. City of Chapman*, 283 P.3d 840, 2012 WL 3822735, at *3 (Kan. Ct. App. 2012) (quoting Black's Law Dictionary 1300 (9th ed. 2009)).

cited any authority showing that the duty to keep truck drivers out of the receiving pens and the duty to sufficiently staff the receiving area could be or are legally recognizable duties under Kansas law. Moreover, both of these duties relate to or directly flow from a landowner's obligation to create a safe place for invitees. Thus, while Plaintiff may have intended to assert a general negligence claim, the duties she asserts that Defendant owed Gates require the Court to examine this case in the context of premises liability.

Kansas premise liability law states that the duty owed by an owner or occupier of land is one of reasonable care under the circumstances.[15] A landowner, however, "is under no duty to remove known and obvious dangers."[16] The Kansas courts have adopted the Second Restatement of Torts in applying this rule.[17] Specifically, § 343A states: "A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness."[18] Comment e to this section further explains the landowner's duty with regard to known and obvious dangers as follows:

> In the ordinary case, an invitee who enters land is entitled to nothing more than knowledge of the conditions and dangers he will encounter if he comes. If he knows the actual condition, and the activities carried on, and the dangers involved in either, he is free to make an intelligent choice as to whether the advantage to be gained is sufficient to justify him incurring the risk by entering or remaining on the land. The possessor of the land may reasonably assume that he will protect himself by the exercise of ordinary care, or that he will voluntarily assume the risk of harm if he does not succeed in doing so. Reasonable care on the part of the possessor therefore does not ordinarily require precautions or even warning,

---

[15] *Jones v. Hansen*, 254 Kan. 499, 509, 867 P.2d 303, 310 (1994).

[16] *Miller v. Zep Mfg. Co.*, 249 Kan. 34, 43, 815 P.2d 506, 514 (1991) (citation omitted).

[17] *See Scales v. St. Louis-San Francisco Ry. Co.*, 2 Kan. App. 2d 491, 497, 582 P.2d 300, 306 (quoting Restatement [Second] of Torts § 343).

[18] Restatement (Second) of Torts § 343A (1965).

-11-

against dangers which are known to the visitor, or so obvious to him that he may be expected to discover them.[19]

Defendant argues that there is no evidence that any of the cattle, which may or may not have injured Gates, had a propensity to be vicious or that Defendant had superior knowledge of such propensity. Defendant further claims that the hazards Gates faced from the cattle at its facility are present any time a person works cattle and that based on Gates' past experience, he was fully aware of these dangers. Thus, Defendant contends that it did not owe any duty to Gates.

In response, Plaintiff argues that to the extent the Court applies the Second Restatement in this case, Plaintiff owed a duty to Gates even though the dangers were known and obvious. Plaintiff cites the exception to the "known and obvious rule," which is found in the last clause of § 343A. Under this clause, a possessor is not liable for open and obvious dangers "*unless the possessor should anticipate the harm despite such knowledge or obviousness*."[20] This exception is further explained in comment f, which states:

> There are, however, cases in which the possessor of land can and should anticipate that the dangerous condition will cause physical harm to the invitee notwithstanding its known or obvious danger. In such cases the possessor is not relieved of the duty of reasonable care which he owes to the invitee for his protection. This duty may require him to warn the invitee, or to take other reasonable steps to protect him, against the known or obvious condition or activity, if the possessor has reason to expect that the invitee will nevertheless suffer physical harm.
>
> Such reason to expect harm to the visitor from known or obvious dangers may arise, for example, where the possessor has reason to expect that the invitee's attention may be distracted, so that he will not discover what is obvious, or will forget what he has discovered, or fail to protect himself against it. Such reason may also arise where the possessor has reason to expect that the invitee will

---

[19] *Id*. comment e.

[20] Restatement Second of Torts § 343A (emphasis added).

proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk.[21]

According to Plaintiff, the situation described in comment f is nearly identical to the situation Fulton anticipated at Creekstone. Plaintiff claims that Fulton's instruction to his employees not to allow truck drivers in the receiving pens reflects an understanding that he knew truck drivers could be injured regardless of their experience or knowledge with cattle. She also claims that Irvin's failure to follow Fulton's instruction resulted in Gates' death. Accordingly, Plaintiff argues that as a result of Fulton's policy, Defendant was required to warn Gates of the risks associated with the risks of being in the receiving pen.

The Court does not agree with Plaintiff that the exception to the known and obvious rule applies in this case. Comment f provides two scenarios in which a landowner is required to protect an invitee from a known or obvious danger. The first scenario is when the landowner has reason to expect that the invitee's attention may be distracted so that he will not discover what is obvious or will forget what he has discovered. This scenario is clearly not applicable here.

The second scenario, which is more pertinent to this case, is when the landowner has reason to expect the invitee will proceed to encounter the known or obvious danger, because to a reasonable person in his position, the advantages of doing so would outweigh the apparent risk. The Restatement provides the following illustration with regard to this exception.

> A owns an office building, in which he rents an office for business purposes to B. The only approach to the office is over a slippery waxed stairway, whose condition is visible and quite obvious. C, employed by B in the office, uses the stairway on her way to work, slips on it, and is injured. Her only alternative to taking the risk was to forgo her employment. A is subject to liability to C.[22]

---

[21] *Id.* comment f.

[22] *Id.*

-13-

Based on this illustration, the second scenario appears to apply when the invitee has no other option but to encounter the hazard.

Another judge in this district recently applied the second scenario in *Cardenas v. Kanco Hay*.[23] The plaintiff in that case was a self-employed trucker who was seriously injured on the defendant's premises after falling while tarping a partial load of hay on his semi-trailer truck.[24] The defendant argued that it was entitled to summary judgment because it did not owe a duty of care to the plaintiff for a known and obvious danger.[25] The court, however, disagreed finding that the defendant had reason to believe that the plaintiff would attempt to tarp the load without reasonably protecting himself from the danger.[26] In finding for the plaintiff, the court specifically noted that the plaintiff presented evidence that there would be significant adverse economic consequences if he declined to perform the contract.[27] This appears to support the Court's conclusion that the second scenario only applies when the invitee has no other option but to encounter the hazard.

The parties discuss two additional cases in their briefs that apply the second scenario found in comment f, although both of these cases apply Oklahoma law.[28] In the first case, *Wood v. Mercedes-Benz*,[29] the defendant car dealership's sprinklers activated during freezing

---

[23] 2016 WL 3881345 (D. Kan. 2016).

[24] *Id.* at *2.

[25] *Id.* at *3.

[26] *Id.* at *4.

[27] *Id.*

[28] Oklahoma law and Kansas law are similar in that they recognize an exception to the open and obvious rule. The Kansas courts have long recognized this exception, but they have not addressed the second scenario found in comment f, which is applicable to this case. *See Scales*, 582 P.2d at 306.

[29] 336 P.3d 457 (Okla. 2014).

temperatures resulting in a layer of ice surrounding the dealership.[30] The plaintiff, who was employed by a catering company, was at the dealership to assist with a catered event.[31] She slipped and fell on the ice, injuring her back.[32] The plaintiff brought a negligence action asserting that the dealership failed to maintain its premises in a reasonably safe condition.[33] The defendant sought summary judgment on the basis that it did not owe the plaintiff a duty of care because the ice was a known and obvious condition.[34] The district court granted summary judgment and the court of appeals affirmed.[35] But the Oklahoma Supreme Court overturned the lower courts' rulings finding that the known and obvious rule did not apply.[36] The Oklahoma Supreme Court explained that this was not a typical case in which the invitee could protect herself by leaving the premises when a known and obvious hazard is encountered.[37] The plaintiff was not a customer of the dealership but was present to fulfill her contractual duty to provide service for an event sponsored by the dealership.[38] The court found that the dealership owed the plaintiff a duty to take measures to protect her from the icy conditions surrounding the

---

[30] *Id.* at 458.

[31] *Id.*

[32] *Id.*

[33] *Id.* at 459.

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.* at 460.

[38] *Id.*

facility.[39]  In this case, it was impossible for the plaintiff to provide catering services in furtherance of her employment if she protected herself by avoiding the ice.

The second case cited by the parties, *Martinez v. Angel Exploration*,[40] presents circumstances that are analogous to *Wood*.  The plaintiff in that case was injured while working on a pump jack (equipment for an underground oil well) that was not protected by safety guards.[41]  The defendant moved for summary judgment on the basis that it did not owe a duty to the plaintiff under the known and obvious rule, and the district court granted the defendant's motion.[42]  The Tenth Circuit reversed and remanded on appeal.[43]  Applying *Wood*, the Circuit found that the exception may apply because (1) the plaintiff was required to encounter the belt as part of his responsibilities; (2) the defendant knew there would be contractors working on the well; and (3) the evidence suggested that by the exercise of ordinary care, the defendant would have had actual knowledge of the dangerous condition.[44]  The Circuit, however, ultimately declined to decide whether the defendant owed the plaintiff a duty of care, stating that it was better on remand for the parties to brief and argue the scope of *Wood* with regard to whether the defendant knew of the dangerous condition.[45]

Here, the undisputed facts do not support the application of comment f to this case.  Gates was not required to be in the receiving pen to perform his job as an independent contractor with

---

[39] *Id*.

[40] 798 F.3d 968 (10th Cir. 2015).

[41] *Id*. at 971.

[42] *Id*.

[43] *Id*. at 972.

[44] *Id*. at 980.

[45] *Id*.

Butler Trucking. Irvin did not ask for Gates help in the pen, and the two men did not speak to each other when Gates was in there. Furthermore, the cattle Gates were helping Irvin move were not the ones he delivered. They were cattle that were already in the pen when he arrived. Although Plaintiff argues that Gates was required to be in the receiving pen because Irvin could not adequately move the cattle because of his size, there is no evidence that this was the case. In fact, the evidence shows that Irvin was able to get the cattle that were bunched up in the east pen moving on his own. Thus, Gates was not required to be in the receiving pen to fulfill any employment or other obligation, and the second scenario described in comment f does not apply.

Because the exception to the known and obvious rule is inapplicable to this case, the duty issue remains guided by the principles in § 343A of the Restatement. Under that section, "[r]easonable care on the part of the possessor . . . does not ordinarily require precautions or even warning against dangers which are known to the visitor, or so obvious to him that he may be expected to discover them."[46] Based on Gates background and experience, he was fully aware of the dangers of working with cattle. Therefore, Defendant did not owe Gates any legal duty to protect him from this known and obvious danger. Defendant is entitled to summary judgment on all of Plaintiff's negligence claims.

Plaintiff's final argument regarding duty of care is that the Court should deny summary judgment because Defendant admitted in its Answer that it had a duty to sufficiently staff its facility for the safe unloading and moving of cattle. The Court has already ruled that this alleged duty is encompassed by premise liability law, and that under such law, Defendant did not owe this duty to Plaintiff. Regardless, even if the Court recognized this duty, the Court would still

---

[46] Restatement (Second) of Torts, § 343A (1965).

grant summary judgment in Defendant's favor because Plaintiff has not come forward with any evidence that Defendant breached this duty. Plaintiff claims that the fact that cattle truck drivers were in the receiving pens shows that Irvin could not move the cattle by himself. This inference, however, is very weak and not supported by the record. Irvin testified that cattle truck drivers would get into the receiving pens only once or twice a week, which means that Irvin often did move the cattle by himself. Furthermore, on the night of the accident, Irvin did not ask for Gates' help in the receiving pen, and he was able to get the cattle moving when they bunched up in the east pen without Gates' help. Therefore, even if the Court recognized that Defendant had a duty to Gates to sufficiently staff its plant, Plaintiff has not come forward with any evidence that Defendant breached this duty. Summary judgment in favor of Defendant is appropriate for this claim.

### B.     Causation and Damages

Defendant seeks summary judgment on three additional bases. The first basis relates to causation while the second and third bases relate to damages. The Court, however, has concluded that Defendant did not owe a duty of care to Gates and granted summary judgment to Defendant on all of Plaintiff's negligence claims. Accordingly, the Court need not address these issues at this time.

The Court also notes that Defendant has filed a Motion to Exclude Expert Testimony Pursuant to Rule 702 (Doc. 79) and a Motion for Hearing Regarding its Motion to Exclude Expert Testimony (Doc. 92). In light of the Court's ruling on Defendant's summary judgment motion, the Court denies these motions as moot.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 77) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude Expert Testimony Pursuant to Rule 702 (Doc. 79) is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Hearing Regarding its Motion to Exclude Expert Testimony (Doc. 92) is **DENIED AS MOOT**.

**IT IS SO ORDERED**.

Dated this 26th day of July, 2017.

*Eric F. Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE